**Richard K. EAMER, d/b/a Mandysland Farm, Defendant/Third–Party Plaintiff,**

v.

**CALUMET FARM, INC., and Ray Stark, Third–Party Defendants.**

Civ. A. No. 92–51.

United States District Court, E.D. Kentucky, at Lexington.

July 8, 1993.

Harvie B. Wilkinson, Stoll, Keenon & Park, Lexington, KY, for plaintiff.

Steven L. Beshear, Ashley W. Ward, Stites & Harbison, Lexington, KY, for third party defendant, Calumet Farm, Inc.

Richard E. Vimont, Vimont & Wills, Lexington, KY, Allan Browne, Laura Seraso, Brown & Woods, Beverly Hills, CA, for defendants.

Keith Moorman, Patrick Madden, Brown Todd & Heyburn, Lexington, KY, for third party defendant, Ray Stark.

## MEMORANDUM OPINION

FORESTER, District Judge.

### I. INTRODUCTION

Plaintiff, Keeneland Association, Inc. ("Keeneland), initiated this action in Fayette Circuit Court to enforce the terms of a purchase and security agreement concerning the auction sale of a 1991 thoroughbred weanling filly by ALYDAR out of CARELESS NOTION ("the Filly") on November 3, 1991, at the Keeneland November Breeding Stock Sale ("the Sale"), wherein the Defendant/Third–Party Plaintiff, Richard K. Eamer, d/b/a Mandysland Farm ("Eamer") purchased the Filly at auction with a bid of Three Hundred Fifty Thousand Dollars ($350,000.00). Subsequent to the Sale, on or about November 4, 1991, the buyer, Eamer, sought to revoke acceptance of the Filly and to rescind the Sale. Consequently, Eamer has not paid Keeneland for the Filly. Keeneland seeks judgment against Eamer in the amount of $350,000.00, plus interest from

November 3, 1991, and its costs and attorney's fees.

The Defendant Eamer removed this action from Fayette Circuit Court and filed a counterclaim against Keeneland seeking rescission of the contract to purchase the Filly, alleging that (1) Keeneland had breached its fiduciary duty to him by failing to provide him with the best available information regarding the health and condition of the Filly, (2) Keeneland had fraudulently and/or negligently misrepresented the true condition of the Filly and had failed to provide him with accurate information concerning the Filly's true condition which Keeneland knew or with the exercise of reasonable care could have known, (3) he has a claim for breach of warranty against Keeneland because the Conditions of Sale on which Keeneland asserted its claim against him are unconscionable, thereby entitling him to punitive damages against Keeneland, and (4) Keeneland breached the Conditions of Sale and its implied warranty to him by failing to announce at the November 3, 1991 auction that the Filly was a cribber.

Subsequently, Defendant Eamer also filed a Third–Party Complaint against the owners of the Filly, Calumet Farm, Inc. ("Calumet") and Ray Stark ("Stark"), who equally coowned the Filly and had consigned the Filly to Keeneland for sale, (1) for fraud, alleging that Calumet and Stark knew the Filly's true condition prior to the Sale and intentionally failed to advise him and other interested buyers of the Filly's true condition, (2) for conspiracy, alleging that Calumet and Stark conspired to misrepresent the Filly's true condition by not advising their agent, Keeneland, thereof, (3) for negligent misrepresentation, alleging that Calumet and Stark knew or with the exercise of reasonable care should have known of the Filly's true condition prior to the Sale and also knowing that the Filly's true condition would not be discovered in the usual and customary pre-sale examination, and (4) for breach of implied warranty, alleging that Calumet and Stark sold the Filly, knowing it was a cribber, without disclosing this fact to him. Eamer's Third–Party Complaint seeks rescission of the purchase contract, compensatory and punitive damages, indemnity for any amounts he may owe Keeneland, his costs, and attorney's fees.

The Third–Party Defendant, Ray Stark, as owner of 50% of the Filly, has filed a counterclaim against the Third–Party Plaintiff Eamer seeking $175,000.00, 50% of the purchase price of $350,000.00, plus interest from November 3, 1991, and his costs and attorney's fees associated with the costs of collection.

This matter is before the Court on the Plaintiff's motion for summary judgment against the Defendant/Third–Party Plaintiff, Eamer, on its complaint and on Eamer's counterclaim against it, and on the motion of the Third–Party Defendant, Stark, for summary judgment against the Defendant/Third–Party Plaintiff, Eamer, on Eamer's complaint against him and on his counterclaim against Eamer for the purchase price of the Filly. Third–Party Defendant, Calumet, has also moved for summary judgment on the Third–Party Complaint. These motions are fully briefed and are ripe for review.

## II. FACTUAL BACKGROUND

In 1990, the Third–Party Defendant Stark, purchased two seasons in the stallion ALYDAR, owned by Third–Party Defendant Calumet. Stark paid Calumet for one of these ALYDAR seasons, the breeding of Stark's mare MARGARET BOOTH to ALYDAR, and Stark and Calumet agreed to a foal sharing arrangement in respect to the other ALYDAR season, the breeding of Stark's mare CARELESS NOTION to ALYDAR, whereby if the mating of these two thoroughbreds produced a live foal, they would be equal co-owners thereof. (Stark Depo., p. 17; Jex Depo., p. 16). The ALYDAR/CARELESS NOTION mating in 1990 resulted a filly being born on March 20, 1991, at Stark's farm in California, the home of the dam, CARELESS NOTION.

Subsequently, the Filly's owners decided to place the Filly in the Calumet dispersal sale, which was held in conjunction with Keeneland's November Breeding Stock Sale on November 3, 1991. The reason the owners decided to place the Filly in Calumet's

dispersal sale was twofold: (1) Calumet owned half of the Filly and needed to sell her as part of its efforts to raise money to pay off its debt, and (2) Stark's tax adviser informed him that his thoroughbred business needed to show a profit in 1991, and the sale of this Filly would help him meet that goal. (Jex Depo., p. 21).

The Filly was weaned from her mother on August 12, 1991. (Jex Depo., p. 24). The weaning process was particularly difficult for the Filly because she was unaccustomed to being around other foals. During the first few weeks after weaning, the Filly "ran the fence," trying to return to her mother. (Jex Depo., p. 75). Explaining this situation, Ron Jex, Stark's farm manager, stated:

A. ...

She—the mare, Careless Notion, had a broken knee, so she was a mare who was on her own all the time while she had her foal. When we weaned her, the foal had not been used to being with other foals, she didn't buddy up with anything for the first two or three weeks and she just ran the fence and tried to get back to mom. And this filly, in the process, wore the fronts of the hoof, the toes on both front feet, so it made her sore. She was just gimpy.

(Jex Depo., p. 23). Within a week after weaning, Jex noticed that the Filly was sore. Consequently, he put the Filly in a stall and called Dr. Doug Herthel, the veterinarian who has serviced Stark's farm for the past thirteen years (Herthel Depo., p. 8) and requested that the Filly be examined. (Jex Depo., p. 25). Dr. Herthel was out of town when Jex called and did not examine the Filly until September 5. (Jex Depo., p. 31). In the interim, Jex kept the Filly in a stall to prevent her from continuing to "run the fence." Her condition improved prior to being examined by Dr. Herthel. (Jex Depo., p. 27).

Dr. James Douglas Herthel is a licensed veterinarian in California. His specialty is surgery on horses and diagnosing lameness in horses. (Herthel Depo. p. 7). Dr. Herthel confirmed Jex's belief that the Filly was sore because she had spent a lot of time running the fence and had worn her two front feet down very short. (Herthel Depo., p. 18). He stated, "The closest medical term you could probably put on is she had bruised her feet. I don't think there is a medical term for wearing her hoof off." (Herthel Depo., p. 19). To protect the hoof from further bruising and wearing while it healed, Dr. Herthel placed fiberglass tape on the hooves of the Filly's front feet. Elaborating on this fiberglass tape, Dr. Herthel explained:

Q   There has been some earlier discussion in prior testimony about the purpose of the acrylic or the fiberglass tape that's been placed on the hooves. In your opinion, would the placing of the tape over the hooves, would that be done to conceal any defect in a horse? Is it done for the purpose of concealment?

A   No. It's only done to protect the hoof.

Q   Done to protect it so it can grow back?

A   If you saw it, I think we used purple or green tape. It was not something to conceal anything. Just strictly to protect that hoof.

Q   To allow it to grow back?

A   The alternative would be to put a shoe on the foot.

Q   I believe you testified that this weanling's foot was really too small for a shoe, so the alternative was to put tape on it?

A   It's difficult to put a shoe on a youngster. To put this tape on it takes about two minutes. I use it for grown horses that lose a shoe.

Q   So it is a fairly typical or common procedure or tender-footed procedure?

A   I use it all the time.

Q   This procedure, placing the tape on the hoof, is it a corrective measure? Does it in any way correct the shape or form of a hoof or a foot or is it purely protective in nature?

A   Purely protective.

(Herthel Depo., pp. 47–48).

After Dr. Herthel initially applied the fiberglass tape to the Filly's front hooves on September 5, he reexamined the Filly nearly three weeks later on September 23 and changed the fiberglass tape. He noted that

the Filly's condition had improved. Also, as a precautionary measure, to be certain that his original opinion that the Filly's sore front feet had been caused by her running the fence on hard ground and that there was no other possible cause for the soreness, he had the Filly's front feet x-rayed the following day, September 24. Dr. Herthel explained:

Q Now, again, this starts "Farm call," so does that mean that he was called to the farm especially that day?

A When I saw the filly the day before, the 23rd, it was—I know it was afternoon. I just requested Dr. Hamer to go up and take some x-rays for me that next morning.

Q Why did you request the x-rays?

A Just precautionary. Just to make sure everything was okay.

Q What was the filly's condition the day before, when you changed the cast?

A She had grown in the two weeks. She had grown quite a bit of foot. And as I recall, there was enough foot there where I actually trimmed some of the heel off and then just reapplied that cast.

Q What was there about her condition that merited precautionary x-rays here when the filly had apparently improved and there was no need to x-ray the horse on September 5, 1991?

A Well, on September 5, I mean, we saw exactly what she had done. Like I said, there had been a history of some of their youngsters doing that before on that same type of ground. So, it wasn't a brand-new situation for us. But, I think the only reason I did it the second time was because of the fact that she was a valuable filly and may have been the fact that she was going to go to sale. Might have been part of it. I don't know. Maybe just good medical practice to just be sure everything was okay.

(Herthel Depo., pp. 24–25).

Concerning what he saw from the x-rays of the Filly's front feet, Dr. Herthel noted that there was a break in the angle of the coffin joint and that the steepness of this angle was "due to the fact that the hoof had been worn down." (Herthel Depo., p. 28). Dr. Herthel also noted that movement in the foot was normal and that the steepness of the coffin joint angle was due to the worn-down hoof; otherwise, the x-rays were normal. (Herthel Depo., p. 29). Dr. Herthel explained:

Q What—after you viewed these x-rays, did you reach any conclusions?

A We essentially just saw—we could see externally was that there was a break in the angle of the coffin joint due to the fact that the hoof wall was gone. Had just confirmed what we saw. Didn't show us that there was anything else, so that satisfied us.

(Herthel Depo., p. 28).

Dr. Herthel affirmatively stated that these x-rays did not show any rotation of the coffin bone. (Herthel Depo., p. 52). Explaining this conclusion, Dr. Herthel elaborated:

Q What is a rotative coffin bone?

A That's a term describing when the angle of the coffin bone is not the same angle as the hoof wall.

Q Is that the same condition that you described with the difference in the angles on these x-rays?

A No. Different. We are talking about two different things.

Q What is the difference, as best you can tell us in layman's terms and without a shadow box to look at the x-rays?

A If you are talking about rotation of the coffin bone, like I say, you look at the line that the hoof wall is making down the front of the hoof and you compare that with the front of the coffin bone line. And normally, that should be parallel, which is what hers were. The break in the angle I'm talking about is up above that area at the joint. Like I say, hers was not a pathological break in angle, just there is a difference in angle.

Q You also took x-rays of the fetlocks. Were they remarkable in any way?

A Normal.

Q When did you view these x-rays?

A The same day they were taken.

Q You don't charge for viewing x-rays?

A No, the charge is included in taking them.

Q Did you report your findings to Mr. Jex?

A Correct. Essentially, I told him they were normal except for the angle being different.

Q You say "essentially." To the best of your memory, exactly what did you tell him?

A Well, I can't remember what I told him. He—I'm sure he called to double check the results or I may have called him. All I can tell you is that based on what we read there, what I saw in the filly, I told him that we were okay and the x-rays were normal and there was no—any surprises.

Q Can you remember approximately when you told him this?

A No—well, I'm sure it was either that evening or the very first thing the next morning, but I can't say for sure.

Q It was within a 24–hour period.

A Sure.

Q Did you talk to anyone else besides Dr. Hamer and Mr. Jex regarding these x-rays?

A No. Not since—whatever, I got this call.

Q Well, I guess I am more interested in between September 24, 1991 and when Mr. Madden called you or Mr. Stark called you regarding this litigation.

A I never talked about the x-rays, I don't think, to anyone since just recently. Since, I guess, we were asked to duplicate them.

(Herthel Depo., pp. 30–32).

A summary of Dr. Herthel's conclusion that the Filly's sore front feet was caused by running the fence on hard ground and that her sore front feet was caused by no underlying pathological defect is seen in the following colloquy:

Q Between your first visit in early September and second visit in late September, you had seen some improvement and some growth back in the hoof or both hooves?

A Correct. She had grown quite a bit of hoof.

Q Due to the protection of the tape that kept the hoof off the ground so it could grow back?

A Correct.

Q You performed a physical examination on the 23rd of September, you found that to be normal in all aspects as far as your physical exam?

A Well—

Q Taking into effect the hoof had not grown—

A Normal except for the fact she needed to grow out more of the hoof.

Q Now, there is some discussion about the slight deviation in the x-rays that you found when those x-rays were taken on the 24th, and you made a difference between anatomical bend and a pathological deviation. The anatomical was because the hoof hadn't grown out all the way; is that correct?

A Yes. In this case, yes.

Q Pathological would be different—

A Pathological is when luxation is permanent or, in other words, the joint's luxated, you can't fix it, it doesn't grow back. In this case, you know, if I took a picture of a horse's ankle, but I picked up the leg and bent the ankle, essentially, when you look at the x-rays, it's luxated even though it's not.

So, in this case, the cause for the change in angle was a mere fact that she wore off the front of her foot. She hadn't wore off the heel as much as she wore off the front, so that made her stand at a different angle.

Q So that is what you mean by anatomical luxation versus pathological?

A Right.

Q Based on your experience, once the hoof completely grew out, that luxation would be back to normal?

A Once this horse was given time to grow out the foot and be trimmed properly.

Q It would be similar to the heel dropping off my shoe, I would be standing different?

A Yeah. You would change your angle by adding or taking off the heel. In other words, you could take the filly, if you put something under the toe, enough rise under the toe, she will all of sudden have a normal angle. That's the difference.

(Herthel Depo., pp. 49–50).

Based on the fact that (1) Dr. Herthel found the Filly to be normal, with the exception of the worn-down front hooves, which had responded to treatment and was not a permanent pathological condition, and (2) there had been no other problems with the Filly while she was at Stark's farm, the owners proceeded to ship the Filly to Kentucky to be placed in the Keeneland November Breeding Stock Sale. The x-rays of the Filly's front feet that were taken on September 24, 1991 remained in Dr. Herthel's office and were not sent along with the Filly to Calumet because Dr. Herthel thought they were normal x-rays; hence, there was no need to forward them with the Filly to Calumet. The following testimony of Ron Jex summarizes the basis for the decision to proceed with placing the Filly in the Calumet dispersal sale:

Q Did you have any other problems with this horse while it was in your care and control?

A None whatsoever.

Q When you had the x-rays taken, I think you testified it was done as a precautionary measure?

A Yes.

Q Typically, the policy on your farm, would that be not to take x-rays if the horse appears normal, but to take x-rays if something shows up that is in any way abnormal or seen by a vet?

A Seen by a vet. Something we would automatically do.

Q Were the back hooves worn down?

A No, sir.

Q Just the front—

A Front.

Q —as you call, toes?

A Yes.

Q When the vet came back to check, x-rayed just the front feet?

A The front feet and ankles.

Q Because you get them all in there?

A Yes.

Q Was there any reason to take x-rays of the behind legs?

A None whatsoever, sir.

Q They were normal?

A Perfectly normal.

Q Never shown lameness, tenderness or—

A No, ever.

Q No swelling or heat in the hind legs?

A Never.

Q You testified that you can't read an x-ray, but your veterinarian that you relied upon told you that the x-rays of the front feet and ankles were normal?

A Yes.

Q Based on the fact that he said they were normal, you didn't see any need to send the x-rays along?

A No. If he said to me, I think Calumet should see these, I would have sent them. But he kept them himself. I never did see them.

Q If the x-rays in any way appeared to show any abnormality, you certainly would have sent the x-rays to Calumet, you would have informed Calumet of the abnormality so Calumet could decide if any announcement should be made?

A Yes.

Q Or even further, to remove the horse from the sale?

A Yes.

Q But there was no need to do that because your veterinarian found the x-rays to be normal?

A Yes.

(Jex Depo., pp. 77–79).

The filly was flown to Kentucky on or about September 28, 1991, (Jex Depo., p. 54), and she arrived in Kentucky wearing the fiberglass tape that Dr. Herthel had placed on her front feet on September 23. Ron Jex advised David Switzer at Calumet that the Filly would be wearing the fiberglass tape

when she arrived. (Jex Depo., p. 49). David Switzer met the Filly when she arrived at Bluegrass Airport in Lexington. (Switzer Depo., p. 22). The Filly was then transported to Calumet Farm, where she was under the supervision of Lane's End Farm, the consignor for the Calumet Farm dispersal sale. (Switzer Depo., p. 20).

After the Filly arrived at Calumet Farm late in the afternoon of September 28, she was initially examined by Dr. Lynda Rhodes Stewart, D.V.M., Calumet's resident veterinarian at the time, the following morning, September 29. (Stewart Depo., p. 8). On Monday, September 30, the following people met with Dr. Stewart to evaluate the Filly: John Ward, the president of Calumet; David Switzer, Calumet's Director of Sales, Mike Cline, the general manager of Lane's End Farm; and David Nadu, a self-employed blacksmith who did blacksmith work for Lane's End Farm and who did all the trimming and shoeing on the weanlings in the dispersal sale. (Stewart Depo., pp. 12–13). At this time, David Nadu removed the fiberglass tape that had been placed on the Filly's front hooves in California. (Stewart Depo., p. 15). After examining the Filly more thoroughly, Dr. Stewart decided to wrap the Filly's front hooves with a bandage material that was softer and more pliable than the fiberglass tape used in California. (Stewart Depo., p. 24). Dr. Stewart monitored the Filly's progress by checking the new bandages every other day, and David Nadu, the blacksmith, evaluated the Filly on a weekly basis. (Stewart Depo., p. 23). The bandages were removed on October 14, and no further bandages were placed on the Filly's front feet. (Stewart Depo., p. 29). Dr. Stewart stated that in her medical opinion, there was no need to take x-rays of this Filly (Stewart Depo., p. 57), and that there was no physical medical reason to remove the Filly from the sale. (Stewart Depo., pp. 65–66).

The Filly remained at Calumet Farm until Thursday, October 31, when she was transported to Keeneland, along with all of the other 126 horses in Calumet's dispersal sale, and was available for inspection, including being x-rayed, by prospective purchasers on October 31 and November 1 and 2, three days prior to the dispersal sale on November 3. (Switzer Depo., pp. 20, 43). David Switzer elaborated:

A. Our policy for this dispersal was if there was not a known problem or a suspected problem, we felt no need to take presale x-rays. However, we made available presale veterinarian inspections advertised such in *The Blood-Horse* magazine, *Thoroughbred Times*, et cetera, that anyone could pre-vet these animals and would make the animals available for radiographs on the Friday, Saturday, prior to between 4:00 and 6:00 p.m. As it turned out, we allowed x-rays all the way up to the horse going up to the sale ring actually.

(Switzer Depo., p. 42).

The medical records which Calumet had on the 127 horses in the dispersal sale were available in Barn # 11 at Keeneland during the pre-sale inspection period for the benefit of prospective buyers (Switzer Depo., 52), and Dr. Stewart was required to be in Barn # 11 at that time to answer questions regarding the medical records of these horses. (Stewart Depo., p. 62). David Switzer explained that signs were prominently displayed to notify prospective buyers of the availability and location of the horses' medical records and that all of the handlers were instructed to direct inquiries to knowledgeable Calumet personnel, as seen from the following colloquy:

Q. On the day of the dispersal sale, where were the medical records that were available on the various horses kept?

A. They were in a tack room in one of the barns. I'm not positive whether it was Barn 11, Tack Room D or which. There were signs in each barn telling where the medical records.

Q. That was my next question. There were signs?

A. There were signs in each of the barns.

Q. To your knowledge, were the grooms and handlers at the sale advised of this?

A. Advised of what?

Q. Where the medical records were located?

A. I would hope so. The signs were right in front of them all day long.

Q. Was there any session, to your knowledge, with the grooms regarding the health and condition of the various horses being sold?

A. There were none for a specific reason. All the grooms were told to—any inquiries on medical records, they were told to tell—refer the folks to tack room such and such in the barn and to see Dr. Rhodes, or they could also ask the representative of the Lane's End Farm or myself who were carrying around records of the animals in each of the three barns.

Q. So that the grooms were specifically told this, that—

A. The grooms had no knowledge really.

Q. Well, I mean, you said they were specificaly (sic) told to refer all inquiries to certain persons at Calumet Farm.

A. I believe that the instructions of Lane's End was that if anyone has medical or past history, production record updates, whatever, that they can see a representative there of the dispersal crew of Lane's End Farm that can be referred to Dr. Rhodes, yes.

(Switzer Depo., pp. 52–54).

The Defendant/Third–Party Plaintiff, Richard Eamer, has a law degree and practiced law for ten (10) years, from 1959 to 1969, when he formed National Medical Enterprises, a corporation, and he has been Chairman of the Board thereof since that time. Eamer has been in the horse business since about 1980. He is the sole proprietor of Mandysland Farm and purchased his first horse about 1980. (Eamer Depo., pp. 7–8). Mandysland Farm has about forty employees and is comprised of three different parcels of land: (1) the original 165–acre tract in Santa Ynez, California; (2) the annex—a parcel of approximately 158 acres about one mile from the original tract in Santa Ynez, California; and (3) a 124–acre tract on New Bedford Road near Paris, Kentucky. (Eamer Depo., pp. 9–10; Cotter Depo., p. 7).

Eamer has attended thoroughbred auction sales at Keeneland, especially the July and September sales, nearly every year since about 1982. (Eamer Depo., pp. 15–16). Eamer is on Keeneland's mailing list, regularly receives the sales catalogs from Keeneland, and thoroughly reads the sales catalogs prior to the sales. (Eamer Depo., pp. 16–17). He has reviewed the Conditions of Sale located in the front of Keeneland's catalogs. (Eamer Depo., p. 21).

Laura Cotter, Eamer's farm manager since 1988 (Cotter Depo., p. 7), also attended the Calumet dispersal sale. On the morning of November 3, the day of the sale, Eamer met with Cotter and Maggie Schweinfurth for breakfast and reviewed with Cotter a list of about twelve horses in which he was interested. After breakfast, Cotter went to Keeneland to inspect these Calumet horses and conferred with Eamer later before the Filly went into the auction ring. (Eamer Depo., pp. 24–25). Cotter estimated that she spent about ten (10) minutes inspecting each horse on Eamer's list. (Cotter Depo., p. 32). Eamer did not accompany Cotter when she made her rounds inspecting these horses. (Cotter Depo., p. 33). Around noon or 1:00 p.m., Cotter inspected the Filly, wrote notes about the Filly in her sales catalog. (Cotter Depo., p. 32). Cotter's notations stated, "Poor, not great, front feet not good, clubby." (*See* Exhibit C to *Plaintiff's Memorandum In Support Of Motion For Summary Judgment*—Docket Entry # 45). Subsequently, Cotter met with Eamer shortly after 2:00 p.m., after the sale had started. (Cotter Depo., p. 33). Eamer inferred that although she thought that the Filly had some problems, they were not "killer problems." (Eamer Depo. p., 26).

Prior to bidding on the Filly, Eamer reviewed Cotter's comments about the Filly she had written in her sales catalog. (Eamer Depo., p. 26). Cotter was not in the sales pavilion with Eamer when he bid on this Filly and was unaware that he had either bid on or purchased this Filly until after the fact. (Cotter Depo., pp. 41–42). After the sale, on November 3, Cotter contacted Dr. William Rood, D.V.M., the regular veterinarian for Mandysland Farm in Paris, Kentucky, and requested him to examine the Filly and the other two horses Eamer purchased at the

Calumet dispersal sale on November 3. (Cotter Depo., pp. 43–45). Dr. Rood was of· the opinion that the Filly had O.C.D. lesions in the left and right hind ankles and had subluxation of the front coffin joints along with a slight rotation of both front coffin bones. (Rood Depo., pp. 15–16). Based on the results of the Dr. Rood's post-sale examination of this Filly, on or about November 4, 1991, through Dr. Rood, Eamer notified Keeneland that he intended to revoke acceptance of the Filly and to rescind the sale.

Consequently, as a result of Eamer's decision not to pay for the Filly and not to remove her from Keeneland, pursuant to the Fourth Condition of the Conditions of Sale, the Filly was subsequently resold at the Keeneland Yearling Sale on September 15, 1992, for Twenty–Five Thousand Dollars ($25,000.00).

## III.  THE MOTIONS FOR SUMMARY JUDGMENT

### A.  *Standard for Summary Judgment*

The Federal Rules of Civil Procedure state that a party is entitled to summary judgment, upon motion, if "there is no genuine issue of material fact and ... the moving party is entitled to a summary judgment as a matter of law." FED.R.CIV.P. 56(c). Where a motion for summary judgment is supported by the moving party, the nonmoving party "may not rest upon the mere allegations or denials of [its] pleadings, but ... must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." FED.R.CIV.P. 56(e).

> The United States Supreme Court has noted that Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

The summary judgment standard "mirrors" the directed verdict standard of Rule 50(a). *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

A party must support its motion for summary judgment by· directing the court to "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which demonstrate the absence of a genuine issue as to a material fact. FED.R.CIV.P. 56(c). However, the. moving party does not need to support its motion by *"negating* the opponent's claim." *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553 (emphasis in original). Although the moving party has the burden of showing conclusively that no genuine issue of material fact exists, all facts and inferences must be viewed in a light most favorable to the nonmoving party.

Moreover, a nonmoving party must rely on more than its pleadings to counter a supported motion for summary judgment:

> In cases ... where the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on "the pleadings, depositions, answers to interrogatories, and admissions on file." Such a motion, whether or not accompanied by affidavits, will be "made and supported as provided in this rule," and Rule 56(e) therefore requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial."

> We do not mean that a nonmoving party must produce evidence in a form that would be admissible at trial· in order to avoid summary judgment. Obviously, Rule 56 does not require the nonmoving party to depose her own witnesses. Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves, and it is from this list that one would normally expect the nonmoving par-

ty to make the showing to which we have referred.

*Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553.

*Celotex* affirms that "nonmoving parties must fulfill their burden of production" once the moving party has met its burden of production. "The Supreme Court—Leading Cases," 100 HARV.L.R. 100, 252 (1986). Once the moving party has met its burden of production, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Where the nonmoving party fails to meet its burden, federal courts are prompted to grant summary judgment motions more often. 100 HARV.L.R. at 252. More importantly, "[t]he trial court has at least some discretion to determine whether the respondent's claim is 'implausible,'" *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1480 & n. 21 (6th Cir.1989), and complex cases or ones involving state of mind issues are not necessarily inappropriate for summary judgment. *Id.* at 1479.

Finally, a nonmoving party cannot merely rely on an allegation that a jury may not believe the moving party's witnesses in order to avoid a summary judgment:

> As we have recently said, "discredited testimony is not [normally] considered a sufficient basis for drawing a contrary conclusion...." Instead, the plaintiff must present affirmative evidence to defeat a properly supported motion for summary judgment.

*Anderson,* 477 U.S. at 256–57, 106 S.Ct. at 2515 (citation omitted); *accord Street,* 886 F.2d at 1479 ("[t]he respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact"); 100 HARV.L.R. at 254 & n. 38.

With this standard in mind, the Court shall proceed to evaluate the motions for summary judgment.

B. *Plaintiff's motion for summary judgment*

As grounds for its motion for summary judgment against Eamer, Keeneland contends that based on the Conditions of Sale, which are found in the front of the sales catalog and which constitute the terms of the sale contract and purchase agreement between it and Eamer, his attempt to revoke acceptance of the Filly and to rescind the sale under theories of breach of warranty, fraud, misrepresentation, and unconscionable conditions of sale is without legal foundation, as seen in *Cohen v. North Ridge Farms, Inc.,* 712 F.Supp. 1265 (E.D.Ky.1989), a similar case in which the purchaser of a yearling at auction at Keeneland did not examine the horse until after the sale and then sought to revoke acceptance of the horse and to rescind the sale.

Thus, it is necessary to examine the Conditions of Sale pertaining to this sale and the applicable law governing the claims of Keeneland and Eamer.

### The Conditions of Sale

The conditions of sale governing the auction at which Eamer purchased the Filly are set out at pages 25–34 of Keeneland's sales catalog entitled *1991 November Breeding Stock Sale.* Particularly relevant to this action are the First, Fifth and Sixteenth Conditions of Sale, which provide, in pertinent part, as follows:

1. *First Condition:* Following the first paragraph which states that the horses included in this sale were offered for sale according to KRS 355.2–328(4), etc., is the concluding paragraph in all capital letters and in bold-face type, which states:

**THERE IS NO WARRANTY IMPLIED BY AUCTIONEER OR CONSIGNOR (INCLUDING OWNER), EXCEPT AS SET FORTH HEREIN, AS TO THE MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF ANY ANIMAL OFFERED IN THIS SALE. ALL SALES ARE MADE ON AN AS IS BASIS, WITH ALL FAULTS.** (Emphasis in original).

2. *Fifth Condition:* [1] This condition begins with the following underlined language in all capital letters and in bold-face type:

---

1. The Fifth Condition is located on page 28 of the *1991 November Breeding Stock Sale* catalogue.

*UNLESS OTHERWISE EXPRESSLY ANNOUNCED AT TIME OF SALE, THERE IS NO GUARANTEE OF ANY KIND EXPRESS OR IMPLIED AS TO THE SOUNDNESS, CONDITION, WIND OR OTHER QUALITY OF ANY ANIMAL SOLD IN THIS SALE* except ... (Emphasis in original).

This condition goes on to provide that in instances where a horse is sold with certain conditions without such conditions being announced at the time of sale, the horse is subject to return to the consignor with a refund of the purchase price, if the purchaser follows certain procedures within certain time frames. This conditional return policy pertains only to (1) a horse that is a "cribber" and (2) a horse of racing age that is nerved, is a "bleeder," or is currently on the Starter's, Stewards' or Veterinarian's list. This condition also gives the buyer a right of rejection concerning a yearling colt that is described as a gelding or a cryptorchid (ridgling) or vice-versa. Additionally, this condition states in bold-face type:

> ... **Other than failure to satisfy the aforementioned expressly warranted conditions, no other defects shall constitute a non-conformity, substantial or otherwise, with the terms of the contract.**

3. *Sixteenth Condition:* This condition states that Keeneland's obligations to both the consignor and the purchaser are limited to the ones expressly imposed by the Conditions of Sale. This condition concludes with the following language in bold-face type:

> ... **All other duties and obligations, including fiduciary and other duties which might otherwise be imposed upon Keeneland by operation of law, are hereby expressly disclaimed, except that Keeneland shall be required to exercise that standard of care generally exercised by other comparable horse auction companies.**

However, apparently due to a printing error, this condition of sale is unidentified as the Fifth Condition and appears to be a part of the Fourth Condition of Sale; however, upon review of the Fourth Condition of Sale located on pages 26–27

## Analysis

The claims raised herein by Eamer are virtually identical to the claims raised in *Cohen v. North Ridge Farms, Inc., supra,* wherein the purchaser of a yearling at the 1988 Select Summer Yearling Sale at Keeneland bought a yearling without having a pre-sale examination performed on the yearling. Subsequently, a post-sale examination of the yearling revealed a flaccid epiglottis, a condition that may or may not affect the yearling's ability to train and to race. The purchaser, Israel Cohen, sought to rescind the sale, asserting claims of fraud and misrepresentation against the yearling's owner and breach of fiduciary duty against Keeneland. Cohen also asserted that Keeneland's Conditions of Sale were unconscionable. *Id.* at 1266–67. The *Cohen* court rejected Mr. Cohen's claims, holding that Keeneland's Conditions of Sale properly limit warranties to certain express conditions, that these conditions of sale are not unconscionable, and that they are legally enforceable. *Id.* at 1269. Consequently, the *Cohen* court granted Keeneland's motion for summary judgment.

Thus, it is necessary to examine the following claims asserted by Eamer against Keeneland and compare them to the claims raised by the buyer in *Cohen:*

### 1. *Breach of fiduciary duty*

■ Eamer claims that Keeneland breached its fiduciary duty to him by failing to provide him with the best available information regarding the health and condition of the Filly. Eamer asserts that Keeneland was obligated to ensure that all information regarding the health and condition of the Filly was provided to him as a potential buyer.

■ As seen in *Chernick v. Fasig–Tipton Kentucky, Inc.,* Ky.App., 703 S.W.2d 885 (1986), a horse auction company is required to use ordinary care to ensure that the information contained in its sale catalog "is as accurate and comprehensive as possible." *Id.* at 890. This is the extent of Keeneland's

. of the sales catalogue, it is clear that the language located on page 28 of the sales catalogue is intended to be a different condition of sale and not a part of the Fourth Condition.

duty to potential buyers of horses at its auction sales. Keeneland is under no duty to subject all horses sold at its auction sales to a pre-sale examination, and Keeneland is under no duty to compel the owners and consignors of the horses sold at its auction sales to have the horses entered therein thoroughly examined and x-rayed prior to the sale and to notify all prospective purchasers of the results of these examinations. The rule of *Chernick* is simply that Keeneland must use reasonable care to ensure that the information contained in its sales catalogs is accurate and comprehensive.

Eamer does not contend that the information describing this Filly in Keeneland's sales catalog is inaccurate or not comprehensive. Instead, he asserts that Keeneland should have taken other steps to ascertain the health and condition of this Filly and to advise him and other potential buyers of this information. However, Eamer attempts to place a duty on Keeneland where none presently exists, as seen in *Chernick* and *Cohen*, which are applicable and controlling precedent on this claim. Based on *Chernick* and *Cohen*, the Court concludes that Eamer's breach of fiduciary claim is without merit.

### 2. *Fraud and/or negligent misrepresentation*

■ In Count 2 of his Counterclaim, Eamer contends that by filing this action against him, Keeneland assumed the rights of the Filly's owners and their obligations to him and all other prospective purchasers of the Filly; therefore, Eamer asserts that any claim for fraud and/or negligent misrepresentation he has against the owners is imputed to Keeneland. Eamer also alleges that Keeneland intentionally failed to advise him and other prospective buyers of the Filly's true, concealed condition.

■ As pointed out by Keeneland, even if Eamer can establish that the owners committed fraud by misrepresenting the Filly's condition, such fraud will not be imputed to Keeneland unless Keeneland had knowledge of such misrepresentation prior to the sale of the Filly. *See Liberty National Bank & Trust Co. v. Gruenberger,* Ky., 477 S.W.2d 503 (1972); *Crawley v. Terhune,* Ky., 437 S.W.2d 743 (1969); *Restatement,* Second, Agency, § 348, Comment b. After discovery was complete, Eamer presented no evidence that Keeneland had any knowledge of any alleged fraud that may have been committed by the Filly's owners. In fact, Eamer himself concluded that Keeneland had no knowledge prior to the Filly's sale of any fraud that may have been committed by the Filly's owners. (Eamer Depo., p. 70). Consequently, the Court concludes that Eamer's claim against Keeneland for fraud and/or misrepresentation is without factual or legal foundation.

### 3. *Breach of warranty*

■ In Count 3 of his Counterclaim, Eamer asserts that the actions of Keeneland in attempting to disclaim the warranties pursuant to the Conditions of Sale are unconscionable, thereby entitling him to rescind the purchase of the Filly.

■ As pointed out by Keeneland, the Conditions of Sale are a sales contract between the seller and purchaser. *See Keck v. Wacker,* 413 F.Supp. 1377, 1381 (E.D.Ky. 1976). Concerning the sale of this Filly, these Conditions of Sale plainly state in conspicuous language that there were no warranties surrounding this Filly; it was sold "as-is." A sales contract that properly excludes all warranties is enforceable. *Greg Coats Cars, Inc. v. Kasey,* Ky.App., 576 S.W.2d 251, 252 (1978); *Childers & Venters, Inc. v. Sowards,* Ky., 460 S.W.2d 343 (1970); and *Cline v. Allis–Chalmers Corp.,* Ky.App., 690 S.W.2d 764 (1985).

The particular Conditions of Sale on which Keeneland relied in bringing this action and in defending Eamer's counterclaim (Conditions First, Fifth and Sixteenth) were previously challenged and upheld in *Cohen v. North Ridge Farms, Inc., supra. Cohen* teaches that the disclaimer of express and implied warranties set out in Keeneland's Conditions of Sale complies with Kentucky statutory and case law; therefore, the general rule is that a horse sold at a Keeneland sale is sold "as-is" and that the buyer has no automatic right to rescind the sale and return the horse. The exceptions to this gen-

eral rule are found in the Fifth Condition of Sale, which states that if no announcement is made concerning a horse that is a "cribber" or a horse of racing age that is nerved, is a "bleeder," or is on the Starter's, Stewards', or Veterinarian's list, a buyer has the right to reject the horse within a specified period of time, depending on the age of the horse.[2]

Thus, it is clear that with the exception of the specific instances outlined in the Fifth Condition of Sale, a buyer has no automatic right to return a horse purchased at a Keeneland auction sale, and Keeneland has properly disclaimed all express and implied warranties. In view of controlling precedent, *Cohen,* the Court concludes that Eamer's breach of warranty claim is without merit.

### 4. *Failure to announce at the November 3, 1991 sale that the Filly was a "cribber"*

In Eamer's First Amended Answer and Counterclaim, Eamer claims that he has the right to rescind the purchase of this Filly because the Filly has been determined to be a cribber[3] and that no announcement was made concerning this condition at the sale on November 3, 1991. Eamer made the same claim against the Third–Party Defendants in his First Amended Third–Party Complaint. In support of this claim, Eamer states that when the Filly was resold at the Keeneland September Yearling Sale on September 15, 1992, Keeneland announced that she was a cribber.

In responding to Eamer's claim that the Filly was a cribber on November 3, 1991, that the Filly's owners failed to disclose this fact, and that Keeneland failed to announce at the sale on November 3, 1991, that the Filly was a cribber, Keeneland and the Third–Party Defendants point out that while the Filly may have become a cribber in the interim between the original sale in Novem-

ber 1991 and the resale in September 1992, there is no evidence to even suggest that the Filly was a cribber at the time of the original sale in November 1991. In support of the owners' defense, they rely on affidavits from the following individuals:

1. *Mike Cline*—Mike Cline, the manager of Lane's End Farm, the consignor for Calumet's dispersal sale, was responsible for preparing Calumet's thoroughbreds for the dispersal sale. Mr. Cline states, "At no time during this Filly's preparation for sale did she exhibit any signs of being a cribber. To my knowledge, when she was sold on November 3, 1991, the Filly was not a cribber." *Affidavit of Mike Cline,* p. 1—Docket Entry # 47.

2. *Dr. Lynda Rhodes–Stewart*—Dr. Stewart, Calumet's resident veterinarian who examined and treated the Filly during the time the Filly was boarded at Calumet prior to the November 1991 sale, states, "At no time during this Filly's preparation for said Calumet Farm Dispersal Sale did she exhibit any signs of being a cribber. When the Filly sold on November 3, 1991, the Filly was not a cribber." *Affidavit of Dr. Lynda Rhodes–Stewart,* p. 2—Docket Entry # 48.

3. *David Switzer*—David Switzer, the Director of Sales at Calumet from April 1991 through November 1991, who personally inspected the horses Calumet was preparing to sell in the dispersal sale, states, "At no time prior to November 3, 1991, or at any time thereafter have I ever witnessed the Filly cribbing. To my knowledge, the Filly was not a cribber at the time she sold on November 3, 1991." *Affidavit of David Switzer,* p. 1—Docket Entry # 49.

4. *Ron Jex*—Ron Jex, Ray Stark's farm manager who personally raised and cared for the Filly from her birth in March 1991 until

---

**2.** The Fifth Condition of Sale also provides a right of return to the purchaser of a yearling sold after July 1 of his yearling year if at the time of sale (1) the yearling is described to be a colt but is at such time a gelding or cryptorchid (ridgling), or (2) the yearling is described to be a gelding but is at such time a colt or cryptorchid (ridgling), if the buyer notifies the auctioneer within forty-eight (48) hours of the sale. Obviously, this portion of the Fifth Condition is not applicable to the present action.

**3.** Dr. Lynda Rhodes–Stewart, D.V.M. advises: "'Cribbing is a learned habit whereby the thoroughbred grabs hold of any fixed object with its teeth, hyperflexes it[s] neck and inhales. In most instances, this habit is observed in horses one year of age or older." *Affidavit of Dr. Lynda Rhodes–Stewart,* p. 1—Docket Entry # 48.

she was transported to Kentucky in September 1991, states:

> 4. At no time prior to the Filly being sold on November 3, 1991, did the Filly ever exhibit any signs of being a cribber. When she left for Kentucky on September 27, 1991, she was not a cribber. Horses generally do *not* become cribbers until later in their life (i.e.. once they become a yearling or even later). (Emphasis in original).

*Affidavit of Ronald E. Jex,* p. 1—Docket Entry # 54.

The evidence submitted by the Filly's owners that at the time the Filly was sold on November 3, 1991, she was not a cribber and had never exhibited any signs of being a cribber stands unrefuted. Assuming the truthfulness of Eamer's allegation that Keeneland announced that the Filly was a cribber when she was resold in September 1992, such a condition in September 1992 in no way proves that the Filly was a cribber in November 1991. As seen from the unchallenged affidavits of Dr. Lynda Rhodes–Stewart and Ron Jex, horses do not generally learn the cribbing habit until they are at least one year old or older. On November 3, 1991, the Filly was seven (7) months old.

Consequently, the Court concludes that Eamer's claim that the Filly was a cribber on November 3, 1991, is totally unsupported by the record. Therefore, his argument that he is entitled to rescind this sale because the owners did not disclose this fact to him and because Keeneland made no announcement on November 3, 1991, that the Filly was a cribber is without factual or legal foundation.

### Eamer's Seventh Defense

In Eamer's First Amended Answer and Counterclaim, he asserts that Keeneland should be estopped from relying on the disclaimer of warranties in its Conditions of Sale in pursuing this action against him and in defending against his counterclaim. As grounds for this argument, Eamer contends that Keeneland does not routinely and uniformly look to these warranty disclaimers to enforce the terms of a purchase and security agreement relating to its auction sales. The essence of this argument is that Keeneland arbitrarily enforces the Conditions of Sale, playing favorites with some but not all buyers who purchase thoroughbreds at its auction sales and permitting some purchasers to return a horse after it has been sold at auction. Eamer implies that depending on the identity of the purchaser, Keeneland has discriminately extended favors to some but not all purchasers who desire to return a horse after sale, and that it is inequitable for Keeneland not to allow him, as a dissatisfied purchaser, to return the Filly to the owners and to rescind this sale. Eamer looks to KRS 355.1–205(3) and statements by Dr. William Rood, D.V.M., and John Ward to support his course of dealing and trade usage argument.

In response to this argument, Keeneland points out that its initial response to disputes arising out of its auction sales is to request the buyer and owner to mediate the dispute, and in the event the parties are unable to resolve their dispute by mediation, Keeneland's next response is to file an action against the buyer for the purchase price of the horse, as seen in the present action and several state court actions[4] wherein the Conditions of Sale have been held to be conscionable and enforceable. Keeneland also reiterates that the Conditions of Sale were upheld in *Cohen v. North Ridge Farms, Inc., supra.* Furthermore, Keeneland contends that Eamer's claim is based on hearsay and that Eamer has come forward with no evidence of specific instances to support his allegation that the Conditions of Sale are arbitrarily and selectively enforced, depending on the identity of the purchaser.

As seen in the Fifth Condition of the Conditions of Sale, Keeneland allows the buyer to return a horse in certain situations. Thus, Eamer cannot rely on the hearsay statements of Dr. William Rood, D.V.M., and John

---

**4.** *See e.g.,* the following actions filed in Fayette Circuit Court: *Keeneland Association, Inc. v. Margaret K. Sherr and Hillary J. Boone, d/b/a Wimbledon Farm,* 85–CI–3468; *Keeneland Association, Inc. v. Louise McClean, et al., d/b/a Char-* *lottesville Connection,* 86–CI–3839, affirmed by unreported Kentucky Court of Appeals decision; *Keeneland Association, Inc. v. Pokoik Racing Stables, Inc., et al.,* 88–CI–163; and *Keeneland Association v. Robert Levy,* 89–CI–294.

Ward regarding the fact that Keeneland allows or even encourages a seller to take back a horse at a buyer's request because the occasions of which Dr. Rood and John Ward have knowledge could very well be situations where a buyer has exercised his right to return under the Fifth Condition. Therefore, the vague, generalized hearsay statements of Dr. Rood and John Ward do not as a matter of law support Eamer's claim of arbitrary or selective enforcement of the Conditions of Sale. Eamer's claim of selective enforcement is further eroded by *Cohen* and the aforementioned state cases wherein the Conditions of Sale have been upheld. Consequently, the Court concludes that Eamer's claim of selective or arbitrary enforcement of the Conditions of Sale is without merit and provides no defense to him herein.

To summarize the Court's analysis of the Keeneland's motion for summary judgment on its complaint and on Eamer's counterclaim, based on a review of this record and the applicable case law, the Court is of the opinion that Keeneland is entitled to summary judgment for the following reasons: (1) the Conditions of Sale put the buyer on notice that horses sold at Keeneland's auction are sold "as-is" with no express or implied warranties; (2) Eamer is an experienced horseman, having attended Keeneland sales nearly every year since 1982, and was familiar with the Conditions of Sale; (3) Keeneland's only duty to Eamer was to use reasonable care to ensure that the information in its sales catalog describing the Filly was accurate and comprehensive; (4) Keeneland was under no duty to have the Filly examined prior to the sale and was under no duty to compel the owners to have the Filly examined prior to the sale; (4) Eamer had the opportunity to fully inspect, examine, and x-ray the Filly prior to the sale; (5) there is no evidence of record to remotely suggest that Keeneland had any knowledge of any alleged defect that was present in the Filly on November 3, 1991, and (6) the Conditions of Sale were held to be valid and enforceable in controlling precedent, *Cohen*, and other state actions.

## C. The Third–Party Defendants' motion for summary judgment

In support of their motion for summary judgment on Eamer's Third–Party Complaint against them and on Stark's counterclaim against Eamer, Stark and Calumet assert that this Filly was sold "as-is," with no warranties, as seen from the Conditions of Sale. Therefore, Eamer has no grounds to revoke acceptance of the Filly and to rescind the sale. Furthermore, Stark and Calumet also contend that Eamer has not proved and that no evidence exists to prove Eamer's claims of fraud, conspiracy, and negligent misrepresentation. Thus, it is necessary to evaluate Eamer's claims in light of the evidence.

### 1. The fraud claim

Eamer's fraud claim concerns the condition of the Filly's hooves at the time of the original sale on November 3, 1991, and also conditions that came to light in post-sale examinations of the Filly. More particularly, Eamer alleges that the Filly's owners defrauded him (1) by misrepresenting the condition of the Filly's front hooves, (2) by failing to reveal that the Filly (a) had rotated coffin bones, (b) had osteochrondosis lesions, and (c) was a cribber.

### a. The condition of the front hooves prior to sale

The undisputed facts show that after the Filly was weaned on August 12, 1991, she bruised, wore down, or injured her small front hooves by "running the fence" on hard ground in an effort to return to her mother. The undisputed facts also show that the condition of bruised hooves or "broken toes" can be remedied by treatment and is not considered a serious, permanent condition that will affect a horse for the duration of its life.

#### Analysis

When Ron Jex, Stark's farm manager, noticed that the Filly's front feet were sore, he began her treatment by putting her up in a stall to prevent her from continuing to run the fence, and he called the farm's regular veterinarian, Dr. Doug Herthel, to request that he examine the Filly. Upon examina-

tion on September 5, Dr. Herthel confirmed Jex's suspicion that the Filly had bruised her front hooves, and he wrapped the Filly's front hooves in a purple or green fiberglass tape to protect the hooves from further injury while they healed. On September 23, Dr. Herthel checked the progress of Filly's front hooves, observed that the condition of the front hooves had improved, and reapplied the fiberglass tape to the hooves. Also, to verify that there was no underlying anatomical condition causing the Filly's feet to be sore, on September 24, Dr. Hamer, a veterinarian in Dr. Herthel's office, x-rayed the Filly's front feet and ankles. Dr. Herthel's impression was that these x-rays were normal, showing no abnormalities. He then advised Ron Jex that the x-rays were normal. Since Dr. Herthel found the x-rays to be normal, he saw no reason to have Ron Jex send the x-rays to Calumet when the Filly came to Kentucky; otherwise, he would have sent the x-rays to Calumet when the Filly was transported to Kentucky.

Within a couple of days after the Filly arrived in Kentucky, she was examined by Dr. Lynda Rhodes–Stewart, Calumet's resident veterinarian. The fiberglass tape placed on the Filly's front hooves in California on September 23 was removed, and Dr. Stewart examined the Filly's front hooves, a blacksmith trimmed the hooves, and Dr. Stewart applied a softer bandage to the Filly's front hooves and checked the hooves every other day until October 14, when the bandages were permanently removed because Dr. Stewart was of the opinion that the front hooves had healed. Like Dr. Herthel, Dr. Stewart saw no reason to x-ray the Filly's front hooves because she also thought the bruised hooves were caused by the Filly's running the fence on hard ground and that no underlying structural abnormality had caused the Filly's front hooves to be sore. Dr. Stewart did not discuss the Filly's sore front feet with Dr. Herthel in California because she, like he, knew that the Filly's sore front feet was not a serious, permanent condition. After the Filly made a full recovery from her sore front feet, Dr. Stewart saw no reason not to enter her in Calumet's dispersal sale on November 3.

On October 30, the Filly was transported from Calumet to Keeneland, where she was available for inspection and x-raying by prospective buyers for three days prior to the sale. Eamer's agent, Laura Cotter, inspected the Filly on November 3, prior to the sale. She observed that the Filly had small, clubby feet, and questioned an unidentified handler or groom about the existence of x-rays on this Filly. She was advised by this unidentified handler or groom that there were no x-rays on the Filly. Ms. Cotter did not ask Dr. Stewart about the Filly's front feet and whether the Filly had been x-rayed. In her Keeneland sales catalog, Ms. Cotter described the Filly as "[p]oor, not great, front feet not good, clubby." (*See* Exhibit C to *Plaintiff's Memorandum In Support Of Motion For Summary Judgment*—Docket Entry # 45).

Eamer reviewed Ms. Cotter's comments about the Filly prior to purchasing the Filly. However, Eamer did not personally examine the Filly prior to sale, did not ask Dr. Stewart any questions about the Filly's front hooves, and did not have the Filly examined and x-rayed by a veterinarian prior to the sale. In the absence of a pre-sale veterinary examination, Eamer proceeded to purchase the Filly for $350,000.00.

■ Thus, it is clear that Eamer's claim that the Filly's owners misrepresented the condition of the Filly's front hooves is unsupported by the record. Both veterinarians who examined and treated the Filly for her sore front feet determined that the bruised front hooves merely required conservative treatment, *viz.*, keeping the Filly in a stall and protecting the hooves with a protective bandage while the hooves healed. Out of an abundance of caution, Dr. Herthel x-rayed the front feet to verify that there was no underlying anatomical problem causing the Filly's front feet to be sore. These x-rays confirmed his belief, he advised Stark's farm manager that the x-rays were normal, and he saw no reason to send these normal x-rays to Calumet. After the Filly arrived at Calumet, Dr. Stewart also recognized that the Filly's sore front feet was not a serious, permanent condition. Dr. Herthel and Dr. Stewart did

not discuss the Filly's condition prior to the sale.

Thus, the Court can only conclude that Eamer's fraud claim against the Filly's owners is without foundation. There is no evidence of record to even suggest that the Filly's owners defrauded him by misrepresenting the condition of the Filly's front hooves prior to the sale. The owners made no representations one way or the other about the Filly's front hooves because through their respective veterinarians, they each thought that the Filly's sore front feet was not a serious, permanent condition and that once this soreness was treated and remedied, it would have no impact on her ability to train and to race. Consequently, the Court also concludes that the owners are entitled to summary judgment on this aspect of Eamer's fraud claim.

## 2. *The rotated coffin bones*

Eamer's claim that the owners defrauded him by not disclosing that the Filly had rotated coffin bones is based on the post-sale examination conducted on the Filly on November 4, 1991, by Dr. William A. Rood, D.V.M. X-rays taken of the Filly's front legs and feet during this examination were read by Dr. Norman Rantanen, D.V.M., to show "slightly" rotated coffin bones and subluxation of the coffin joints.

The Filly's front legs were x-rayed again in April of 1992. Dr. Rolf M. Embertson, D.V.M., of the Rood and Riddle Equine Hospital, read the x-rays taken in November 1991 and the x-rays taken in April 1992, and concluded that the Filly's front feet have improved and are now essentially normal. His opinion is contained in a letter dated April 7, 1992, to Laura Cotter, and states in pertinent part:

... The left front foot shows no rotation of P–3, no subluxation of the coffin joint, and the distal margin of P–3 is within normal limits. The right foot has the same findings as the left front foot on the most recent films.

The left and right front feet have improved and appear essentially normal on the April 3, 1992 radiographs.

(*See* Exhibit 8 to *Third–Party Defendant, Ray Stark's Memorandum In Support Of Motion For Summary Judgment*—Docket Entry #51).

Subsequently, Dr. R.F. Redden, D.V.M., also read the x-rays taken of the Filly by Dr. Rood's office on November 4, 1991, and April 3, 1992. Dr. Redden concurred with the opinion of Dr. Embertson that the Filly no longer exhibited rotated coffin bones, as seen in his report dated April 14, 1992, which states in pertinent part:

The radiographs are of very good quality, that clearly revealed the sensitive-non-sensitive lamellar junction and this line is apparently parallel to the face of PIII, therefore I conclude that the apparent total recovery of the previous reported rotation is in line with a normal favorable response often seen with club feet.

(*See* Exhibit 9 to *Third–Party Defendant, Ray Stark's Memorandum In Support Of Motion For Summary Judgment*—Docket Entry #51).

### Analysis

█ It is clear that x-rays must be taken of a horse's front feet and legs to determine if the horse has rotated coffin bones and that this condition cannot be detected by a visual examination with the naked eye.

The x-rays taken of the Filly's front feet and ankles on September 24, 1991, by Dr. Hamer in Dr. Doug Herthel's office were read by Dr. Herthel to be normal x-rays. In fact, Dr. Herthel affirmatively stated that these x-rays did not show any rotation of the coffin bone. (Herthel Depo., p. 52). To reiterate, Dr. Herthel advised Ron Jex, Stark's farm manager, that the x-rays were normal. Therefore, Dr. Herthel saw no need to send these normal x-rays to Calumet when the Filly was transported to Kentucky. While the Filly completed her recovery from bruised front hooves at Calumet, Dr. Stewart did not take x-rays of the Filly's front feet and ankles because there was no indication from her examination of the Filly that there was any anatomical or structural abnormality requiring the Filly to be x-rayed for further diagnosis or treatment.

Consequently, the Filly was not x-rayed again until she was examined after the sale by Dr. Rood on November 4, 1991. At that time Dr. Norm Rantanen, a radiologist, was reading films for Dr. Rood's office. Concerning the coffin bones and joints, Dr. Rantanen thought the coffin bones were slightly rotated, as seen from his impression:

> ... There is slight rotation of both fore third phalanges and beginning remodeling of the margins of the third phalanges. There is subluxation of the coffin joints.

(*See* Exhibit 6 to *Deposition Of Laura Goddard Cotter*—Docket Entry # 42). Dr. Rood reiterated his findings in his report to Eamer and in his letter to Keeneland dated November 4, 1991, whereby he notified Keeneland that Eamer did not intend to remove the Filly from Keeneland's grounds. (*See* Exhibit 5 to *Deposition Of Laura Goddard Cotter*—Docket Entry # 42).

The Filly was x-rayed again on April 3, 1992. As noted earlier, Dr. Embertson, a veterinarian with Rood and Riddle Equine Hospital, interpreted these x-rays of the Filly's feet and ankles to be normal; he concluded that there was no rotation of the coffin joints and no subluxation of the coffin joints. Dr. Embertson stated, "The left and right front feet have improved and appear essentially normal on the April 3, 1992 radiographs." (*See* Exhibit 8 to Third–Party Defendant, Ray Stark's Memorandum In Support Of Motion For Summary Judgment—Docket Entry # 51). On April 14, 1992, Dr. R.R. Redden, D.V.M., also read the x-rays of the Filly taken on November 4, 1991 and April 3, 1992, and concurred with Dr. Embertson's opinion concerning the rotated coffin joints.

A chronological review of the interpretations of the Filly's x-rays reveals that in September 1991, Dr. Herthel thought the Filly exhibited normal coffin bones, with no signs of rotation. Subsequently, in November 1991, Dr. Rantanen thought later x-rays taken in November 1991 showed rotated coffin bones and subluxation of the coffin joints. However, x-rays taken in April 1992 were read by Drs. Embertson and Redden to be normal, indicating that the Filly was no long-er suffering from rotated coffin bones and subluxation of the coffin joints.

Thus, it appears that if indeed the Filly at one time had rotated coffin bones, she has apparently outgrown this condition. However, there is no evidence that at any time prior to the Filly's sale that the owners or any of their agents had any knowledge that the Filly had rotated coffin bones, a condition that can be seen in x-rays but that cannot be detected by a visual inspection with the naked eye. Consequently, the Court is of the opinion that Eamer's claim that the owners defrauded him by not disclosing to him that the Filly had rotated coffin bones is without foundation because there is *no* evidence to suggest that the owners knew or had any reason to know that the Filly might have this condition prior to the sale. The owners are entitled to summary judgment on this claim.

### 3. The osteochrondrosis (O.C.D.) lesions

When Dr. Rood examined the Filly on November 4, 1991, he also took x-rays of the Filly's hind ankles and feet. Dr. Rantanen read these x-rays as indicating osteochrondrosis ("O.C.D.") lesions in the hind feet and ankles. Dr. Rood confirmed Dr. Rantanen's impression in his report to Eamer and to Keeneland. The O.C.D. lesions are another reason Eamer desires to revoke acceptance of the Filly and to rescind this sale.

Dr. Rantanen stated that an O.C.D. lesion "implies a developmental abnormality where the bone and cartilage osteochrondo has a weakening in it, and it forms a defect as the animal grows." (Rantanen Depo., p. 28). O.C.D. lesions cannot be detected by a visual examination with the naked eye; they are only seen in x-rays or seen in surgery. Thus, a horse can appear perfectly normal on a visual inspection and still have an O.C.D. lesion. (Rantanen Depo., p. 28; Van Balen Depo., pp. 11, 18; Rood Depo., p. 10; Redden Depo., p. 21). Further, an O.C.D. lesion may or may not affect the ability of a horse to train and to race. (Rood Depo., p. 49; Van Balen Depo., pp. 14, 18).

## Analysis

Due to the fact that the Filly had never exhibited any signs of lameness or soreness in her hind feet and ankles prior to or even after the sale, the owners had no reason to x-ray the Filly's hind feet and ankles, which appeared to be perfectly normal. It is routine practice in the horse industry that in the absence of some type of abnormality, an owner does not customarily x-ray all of the joints of a horse prior to putting the horse in a public auction sale. (Jex Depo., pp. 48, 60; Cotter Depo., pp. 9, 72; Eamer Depo., p. 12). Thus, the owners had no duty to x-ray both the front and rear feet and ankles and provide such x-rays to prospective purchasers prior to the sale. For this reason and the reason that the horses sold at Keeneland in the November 1991 sale were sold "as-is," with no warranties, the Filly was made available at Keeneland for three days prior to the sale for full inspection, including x-raying, by any prospective purchaser.

Unlike the rotated coffin bones, all post-sale x-rays taken of the Filly's hind feet and ankles have been read to show O.C.D. lesions in the Filly's hind feet and ankles. However, it is still uncertain whether these O.C.D. lesions will hinder the Filly's ability to train and to race, as seen from Dr. Embertson's letter of April 7, 1992 to Laura Cotter, wherein he states:

> ... The left hind and right hind fetlock abnormalities noted on both films may never adversely affect the horse. However, if the fragment in the left hind fetlock is free-floating in the joint, this may irritate the joint when the horse is trained. In general, intra-articular fragments are best removed for the long term health of the joint.

(*See* Exhibit 8 to *Third–Party Defendant, Ray Stark's Memorandum In Support Of Motion For Summary Judgment*—Docket Entry # 51).

Consequently, since this record is completely void of any evidence indicating that the owners had any reason to suspect that the Filly had O.C.D. lesions in her hind fetlocks on November 3, 1991, Eamer's claim that the owners defrauded him by not advising him of this condition prior to the sale is

without merit. Mr. Eamer, a veteran in the thoroughbred industry for more than ten (10) years, is reminded that the Filly was sold "as-is," with no warranties. Thus, it was incumbent on Eamer to fully inspect the Filly, including x-raying the Filly, prior to the sale. The owners are entitled to summary judgment on this issue.

### 4. The claim that the Filly was a cribber on November 3, 1991

Eamer also claims that he has the right to revoke acceptance of the Filly and to rescind the sale because when the Filly was resold at the Keeneland September Yearling Sale on September 15, 1992, Keeneland announced that she was a cribber. Thus, the essence of Eamer's fraud claim against the owners is that they failed to disclose to him the fact that the Filly was a cribber on November 3, 1991.

This issue was addressed in detail, in Section III.B., *supra*, at pp. 30–32, when evaluating Eamer's claim against Keeneland for failure to announce on November 3, 1991 that the Filly was a cribber. Summarizing the evidence on Eamer's cribber claim, there is no proof that the Filly was a cribber or that she had ever exhibited any tendency to be a cribber prior to the sale on November 3, 1991. The evidence suggests that the Filly became a cribber in March of 1992, when she was approximately one year old. However, Eamer's claim that she was a cribber on November 3, 1991, is totally without foundation. The owners are entitled to summary judgment on this issue.

### Applicable Law

In Kentucky, the six elements of fraud are: (1) a material misrepresentation; (2) which is false; (3) known to be false or made recklessly; (4) made with the intent that it be acted upon; (5) actual reliance; and (6) injury. *Wahba v. Don Corlett Motors, Inc.*, Ky.App., 573 S.W.2d 357, 359 (1978); *Keck v. Wacker, supra.* Each of these six elements must be proved by clear and convincing evidence. *Combs v. Salyer*, Ky., 165 S.W.2d 40, 44 (1942); *Terrill v. Carpenter*, 143 F.Supp. 747 (E.D.Ky.1956). Fraud will not be presumed or inferred ex-

cept from proven or admitted facts. *Sparks v. Baker*, Ky., 272 Ky. 663, 114 S.W.2d 1145, 1150 (1938).

A review of this record leads the Court to conclude that Eamer's claims of fraud, conspiracy, and negligent misrepresentation against the owners must fail because these allegations find no support in the record.

Concerning the Filly's front hooves, it is clear from the record that while the owners were aware that the Filly had bruised her front hooves running the fence, the owners believed and the veterinarians for the two owners (Dr. Herthel in California and Dr. Stewart in Kentucky) knew that the bruised front hooves was not a serious, permanent condition and that this condition was remedied by common-sense treatment. Consequently, they kept the Filly in a stall and wrapped her front hooves in a protective bandage to protect the front hooves from further injury while they healed. Dr. Stewart concluded that the front hooves had fully healed by October 14, 1991, and the bandages were permanently removed.

The x-rays taken by Dr. Herthel's office in California were read as normal x-rays; therefore, there was no need to send these x-rays to Calumet when the Filly was transported to Kentucky. After the Filly came to Kentucky, Dr. Stewart observed that the Filly's front hooves were responding to treatment; therefore, she saw no need to x-ray the Filly's front feet and ankles. At no time prior to the sale did Dr. Herthel and Dr. Stewart discuss the Filly's condition.

Concerning the O.C.D. lesions in the Filly's hind fetlocks, it is undisputed that prior to the sale, the Filly had exhibited no signs or lameness or soreness in her hind fetlocks. Thus, there was no need to x-ray the hind fetlocks prior to the sale because they appeared perfectly normal on visual examination. Since O.C.D. lesions can only be detected by x-rays or seen in surgery, and since the Filly was sold "as-is," Eamer had the duty to exercise reasonable diligence in inspecting the Filly. *Cohen v. Wedbush, Noble, Cooke, Inc.*, 841 F.2d 282 (9th Cir.1988). Thus, Eamer was obligated to fully inspect and examine the Filly, including x-rays, prior to the sale, and Eamer cannot pass the buck

to the owners for his failure to have the Filly examined prior to the sale when he knew or should have known that the Filly was being sold "as-is," with no warranties.

Concerning the claim that the Filly was a cribber on November 3, 1991, again there is simply no evidence to support this claim. The fact that the Filly may have become a cribber post-sale in the Spring of 1992 is irrelevant to this action.

The lack of evidence to support Eamer's claims of fraud, conspiracy, and negligent misrepresentation is seen in the report of Dr. Craig Van Balen, D.V.M., who examined the Filly on November 6, 1991, which states in pertinent part:

On 11–6–91, I examined hip # 123 from the Keeneland Fall Sale. This Alydar/Careless Notion weanling filly has obvious club-footed conformation. There was *no evidence of any effort to disguise the conformation of the front feet*. The rear ankles did not appear abnormal upon flexion or visual examination.

Radiographs taken by Rood and Riddle showed the following:

1. Sever OCD lesion left hind ankle

2. OCD with loose fragment right hind ankle

3. Subluxation of both front coffin joints

4. Slight rotation of both front coffin bones

5. Slight remodeling of coffin bone margin in both front feet

(*See* Exhibit 7 to *Deposition Of Laura Goddard Cotter*—Docket Entry # 42).

## IV. CONCLUSION

Based on a review of the factual background leading up to the filing of this action, the depositions, controlling precedent, *Cohen v. North Ridge Farms, Inc., supra,* and other applicable case law, for the reasons expressed above, the Court concludes that the Keeneland is entitled to summary judgment on its complaint and on Eamer's First Amended Counterclaim, that Stark and Calumet are entitled to summary judgment on Eamer's Third–Party Complaint against

them, and that Stark is entitled to summary judgment on his counterclaim against Eamer.

An Order and Judgment in accordance with this Memorandum Opinion will be entered on the same day herewith.

## ORDER AND JUDGMENT

In accordance with the Memorandum Opinion entered on the same date herewith,

**IT IS HEREBY ORDERED** and **ADJUDGED** that:

1. The motion of the Plaintiff, Keeneland Association, Inc., for summary judgment on its Complaint and on the First Amended Counterclaim of the Defendant/Third–Party Plaintiff, Richard K. Eamer, d/b/a Mandysland Farm, (Docket Entry # 44) is **GRANTED.**

2. As a matter of law, the Defendant/Third–Party Plaintiff, Richard K. Eamer, is not entitled to revoke acceptance of the ALYDAR/CARELESS NOTION filly and to rescind the sale of this filly on November 3, 1991.

3. The Plaintiff, Keeneland Association, Inc., is hereby awarded judgment against the Defendant/Third–Party Plaintiff, Richard K. Eamer, for the purchase price of the ALYDAR/CARELESS NOTION filly in the amount of $350,000.00, plus pre-judgment interest from the date of sale, November 3, 1991, plus applicable post-judgment interest, its costs and attorney's fees. However, Keeneland's judgment is reduced to $325,000.00, due to the resale of the ALYDAR/CARELESS NOTION filly on September 15, 1992, for $25,000.00.

4. The motions of the Third–Party Defendants, Ray Stark and Calumet Farm, Inc., for summary judgment on the First Amended Third–Party Complaint (Docket Entry ## 50 and 53) are **GRANTED.** The First Amended Third–Party Complaint against Ray Stark and Calumet Farm, Inc., is **DISMISSED,** and Ray Stark's counterclaim against Richard K. Eamer is **DISMISSED,** having been rendered moot by the judgment awarded to Keeneland on its complaint against Richard K. Eamer.

5. All issues having been resolved, this action is **DISMISSED** and **STRICKEN** from the docket.